IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 24, 2025

**STATE OF TENNESSEE v. ISAIAH FRENCH**

**Appeal from the Criminal Court for Shelby County**
**No. 19-02071      Lee V. Coffee, Judge**

_____

**No. W2024-01637-CCA-R3-CD**

_____

The Defendant, Isaiah French, was convicted by a Shelby County jury of one count of premeditated first degree murder, two counts of attempted premeditated first degree murder resulting in serious bodily injury, two counts of employment of a firearm during a dangerous felony, and three counts of possession of a firearm by a convicted felon, and the trial court imposed an effective sentence of life in prison without parole as a repeat violent offender plus 120 years. On appeal, the Defendant argues that the evidence was insufficient to support his convictions of premeditated first degree murder and attempted first degree murder and that the trial court erred by denying his motion to bifurcate the charges of possession of a firearm by a convicted felon from the remaining counts of the indictment. Discerning no error, we affirm.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

STEVEN W. SWORD, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and MATTHEW J. WILSON, JJ., joined.

Phyllis Aluko, District Public Defender; Tony N. Brayton, Assistant District Public Defender, Appellate Division (on appeal); and Mark Renken and Melody Carlisle, Assistant District Public Defenders (at trial), for the appellant, Isaiah French.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Alandra Dwyer and Leslie Byrd, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

# I.  FACTUAL AND PROCEDURAL HISTORY

On April 2, 2019, a Shelby County Grand Jury returned an eight-count indictment charging the Defendant with one count of premeditated first degree murder, two counts of attempted premediated first degree murder, two counts of employment of a firearm during a dangerous felony, and three counts of possession of a firearm by a convicted felon. The Defendant's trial commenced on May 20, 2024.

Memphis Police Department ("MPD") Officer William Urbanski testified that in the early morning hours of March 24, 2019, he was the first officer to respond to a report of a shooting at a home on Hyde Park Boulevard. The 911 dispatcher testified that the call came in at 3:32 a.m. After arriving, Officer Urbanski was approached by a neighbor, Michael Glover, who informed him that three people had been shot in one of his neighbor's houses and that one of the victims had walked over to his house to seek help. Mr. Glover testified there was a duplex between his home and the duplex where the shooting occurred, and he had not heard anything prior to the knock on his door. Mr. Glover testified he did not know the Defendant or the victims, but he had recognized the victim who came to his door from around the neighborhood. Officer Urbanski never interacted with the victim who went to Mr. Glover's house, but he entered the house where the shooting had occurred and saw a woman lying face down on a couch and a man lying on the floor to her left. As both victims had suffered head injuries and were not moving, Officer Urbanski believed them to be dead and exited the house to await backup.

After backup and emergency medical personnel arrived, Officer Urbanski and another officer cleared the house to be sure the suspect was not in the home before emergency medical personnel entered. The officers located an uninjured dog in the back bedroom while clearing the house. They shut the door to the back bedroom to keep the dog away from the crime scene. Officer Urbanski reentered the house with medical personnel and saw the female victim's "back rising." Officer Urbanski informed a paramedic that the female victim "might actually be alive," and several paramedics began treating the victim's wounds. Officer Urbanski testified the male victim was pronounced dead at the scene. He described the scene as looking like "an execution," and footage of his entry into the house taken from his body camera was played for the jury. Another officer testified that the murder weapon was never recovered.

Anetria Hall (a.k.a. "Cootie"), the surviving female victim, and Nakia Huntley, the surviving male victim, both testified Ms. Hall was the cousin of Mr. Gary Ballard (a.k.a. "Bo") and Mr. Huntley was Mr. Ballard's friend. Ms. Hall and Mr. Huntley had been visiting Mr. Ballard's residence on Hyde Park Boulevard at the time of the shooting. Dr. Danielle Harrell, the Assistant Medical Examiner for Shelby County, testified that Mr. Ballard was shot in the hip and in the head and that both wounds were fatal. She testified

- 2 -

that the head wound showed stippling which meant the shot was taken from a location of approximately a few inches to a few feet away.

Mr. Huntley testified that at approximately 11:00 p.m. on March 23, 2019, the Defendant (a.k.a. "Tojo") drove himself and Mr. Ballard to a location so that Mr. Ballard could purchase cocaine, which Mr. Ballard and the Defendant used that evening. Mr. Huntley further testified the three men then went to a gas station at about 11:30 p.m. At the station, the Defendant talked outside with a female he knew named Crystal while Mr. Ballard and Mr. Huntley went inside the gas station. MPD Lieutenant Samuel McMinn testified that video surveillance from the gas station, which was shown to the jury, corroborated Mr. Huntley's testimony concerning the events at the store and the time of the events. The video also showed the Defendant wearing a reflective vest at the store.

The three men then drove to Mr. Ballard's house on Hyde Park Boulevard, and Crystal followed them there. Mr. Ballard and Mr. Huntley went inside the house while the Defendant stayed outside to talk more with Crystal. Mr. Huntley testified that, when the Defendant entered the house, Mr. Ballard told the Defendant that "messing with that bitch . . . gonna get you killed" because Crystal was seeing another man. Mr. Huntley testified the Defendant "flipped," and before leaving the house, the Defendant told Mr. Ballard twice that he should not have told him that. Mr. Ballard and Mr. Huntley then sat on the porch talking to some of Mr. Ballard's friends who drove up intermittently throughout the evening.

According to Ms. Hall and Mr. Huntley, Ms. Hall arrived at Mr. Ballard's house sometime between approximately 1:00 a.m. and 2:00 a.m. on March 24, 2019. They both testified to having sat on sofas in the living room watching television while Mr. Ballard was listening to music and dancing around in the threshold between the living room and the kitchen area. About half an hour after Ms. Hall arrived, there was a knock at the door, and Mr. Ballard opened the door to let the Defendant into the house. Mr. Huntley testified that the Defendant was dressed in all black clothing, which was different than how he had been dressed earlier in a reflective vest. Mr. Huntley decided to try to get some sleep. Mr. Ballard returned to the kitchen, and the Defendant and Mr. Ballard were talking and joking. Both Mr. Huntley and Ms. Hall recalled that the Defendant and Mr. Ballard discussed something about a couple of dollars, but nothing that seemed to be a problem. Mr. Huntley had turned toward the sofa to try to go to sleep. Ms. Hall testified that she sensed something appeared to be wrong after about ten to fifteen minutes. Ms. Hall thought the Defendant had left the house, but when she looked towards the front door, she saw the Defendant quietly close the door and pull a gun out of his jacket. Ms. Hall stated she shouted "he finna shoot us" to Mr. Huntley, who she said then turned toward the room to see what was happening. Both Ms. Hall and Mr. Huntley testified that no one in the house except the Defendant was in possession of a firearm.

According to Mr. Huntley, he had just started to try to go to sleep when he heard a shot and turned to see Mr. Ballard going backwards. He believed Mr. Ballard was dead when he went down. The Defendant shot Ms. Hall and then Mr. Huntley in the arm. The Defendant then shot Ms. Hall again and Mr. Huntley in the neck. The Defendant shot Ms. Hall two more times, and she fell to the sofa "in a prayer position" with her knees on the ground and the top of her body on the couch. The Defendant then went over to Mr. Ballard and shot him in the head. The Defendant shot Mr. Huntley a third time while Mr. Huntley was pretending to be dead. The Defendant then turned and shot Ms. Hall in the head before again shooting Mr. Huntley. Mr. Huntley recalled the room being quiet and the Defendant going to the table and taking his and Ms. Hall's cell phones from the table as he began to leave. Mr. Huntley testified that because the dog was in his way, the Defendant shot at the dog. After the dog moved, the Defendant left.

Mr. Huntley testified he waited until he was sure the Defendant was gone before picking up Mr. Ballard's phone to try to call 911 and checking to see that Mr. Ballard was dead. He could hear Ms. Hall still breathing. He stated he had gone toward the back of the house, but he came back to the front to leave because there was only one way in and out of the house. Mr. Huntley left the house and walked over to Mr. Glover's house while talking to the 911 operator. Mr. Huntley went inside Mr. Glover's house, and Mr. Glover then took the phone and spoke with the 911 operator. Both Mr. Glover and Mr. Huntley estimated it took about five minutes for the paramedics to arrive.

Mr. Huntley was shot five times, including in the neck, arm, leg, and penis. The paramedics took Mr. Huntley to the hospital, and he recalled he had two surgeries, one on his penis and one on his arm. He testified he lost the use of both his penis and his hand because of his injuries. The bullet in his neck was not removed because of the potential danger of paralysis. Mr. Huntley identified the Defendant both during the investigation[1] and at trial as the person who shot him, Mr. Ballard, and Ms. Hall.

Ms. Hall testified that she thought the Defendant first shot Mr. Huntley three times. She testified that the Defendant then shot Mr. Ballard twice, so she attempted to get up and wrestle the gun away from the Defendant, but she was shot during the struggle. She testified she was shot in the chest, in the stomach, and in the head. She stated she did not remember being shot in the chest and stomach because she "blanked out." She recalled the Defendant pulled her back to the couch and put a jacket over her head before he shot her

---

[1] During the investigation, both Mr. Huntley and Ms. Hall identified the Defendant from a photo array as the person who had shot them. They both identified the Defendant as "Tojo" because they knew who he was by his nickname but not by his real name. Both testified they did not really know the Defendant, but they knew who he was. The investigation produced the Defendant's real name, and the United States Marshalls' Office located the Defendant.

- 4 -

in the head. She testified that the next thing she remembered was the ambulance and police being at the house, but she did not recall them helping her. Her next memory was being in the hospital on a ventilator. Ms. Hall was shot a total of six times, twice in the chest, three times in the stomach, and once in the head. Ms. Hall testified she had a metal plate in her head and was in rehab and unable to speak for two months following the shooting; she also still walked with the aid of a cane at the time of trial. Ms. Hall identified the Defendant both during the investigation and at trial as the person who shot her, Mr. Ballard, and Mr. Huntley.

As testified to by the medical examiner, Mr. Ballard was shot twice, both of which were fatal.

The State rested. Following a *Momon* colloquy, the Defendant elected not to testify and presented no additional witnesses. Upon this proof, the jury convicted the Defendant as charged. Following a bifurcated sentencing hearing, the trial court imposed an effective sentence of life imprisonment without parole plus 120 years. This appeal followed.[2]

## II. ANALYSIS

On appeal, the Defendant argues that the evidence was insufficient to support his convictions of premeditated first degree murder and attempted premeditated first degree murder and that the trial court erred by denying his motion to bifurcate the charges of possession of a firearm by a convicted felon from the remaining counts of the indictment. The State contends that the evidence is sufficient as to each of the challenged convictions and that the trial court acted within its discretion in denying the Defendant's motion to bifurcate. We will address each issue in turn.

### A. SUFFICIENCY OF THE EVIDENCE

The Defendant argues that the evidence was insufficient to support his convictions of premeditated first degree murder and attempted premeditated first degree murder because the State failed to prove premeditation. The Defendant also alleges that the State did not prove that he was free from excitement or passion. The State responds that the Defendant is not entitled to relief because the evidence of premeditation is sufficient to support all three convictions.

---

[2] The Defendant's notice of appeal was untimely; however, this Court waived the timely filing requirement by order entered November 1, 2024.

"Findings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The standard of appellate review on a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted) (emphasis in original); *see also State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *see also State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000)). "On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom." *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007) (citing *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999)). "We do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury as the trier of fact." *State v. Curry*, 705 S.W.3d 176, 183 (Tenn. 2025) (citations omitted). The same standard of review applies "whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *Williams*, 558 S.W.3d at 638 (first citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011), and then citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977)).

First degree murder is statutorily defined as a "premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2018). A premeditated act "is an act done after the exercise of reflection and judgment." Further,

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (2018). As relevant here, a defendant acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim. Tenn. Code Ann. § 39-11-302 (2018). "The existence of premeditation is a question of fact to be determined by considering all of the evidence." *State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021) (first citing *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017),

and then citing *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013)). "Because premeditation involves the defendant's state of mind, of which there is often no direct evidence," premeditation may be sufficiently proven through circumstantial evidence, and a jury may reasonably infer premeditation from the manner and circumstances of the killing. *Reynolds*, 635 S.W.3d at 916–17 (first citing *State v. Davidson*, 121 S.W.3d 600, 614-5 (Tenn. 2003), and then citing *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009)). The Tennessee Supreme Court has discussed the types of evidence which may be indicative of premeditation as follows:

> Through multiple cases over many years, we have identified numerous specific circumstances that may bear on the existence of premeditation:
>
> (1) The use of a deadly weapon on an unarmed victim;
> (2) The particular cruelty of the killing;
> (3) Threats or declarations of intent to kill;
> (4) The procurement of a weapon;
> (5) Any preparations to conceal the crime undertaken before the crime was committed;
> (6) The destruction or secretion of evidence of the killing;
> (7) Calmness after the killing;
> (8) Evidence of motive;
> (9) The use of multiple weapons in succession;
> (10) The infliction of multiple wounds or repeated blows;
> (11) Evidence that the victim was retreating or attempting to escape when killed;
> (12) The lack of provocation on the part of the victim; and
> (13) The failure to render aid to the victim.
>
> *See, e.g., Clayton*, 535 S.W.3d at 845; *Dickson*, 413 S.W.3d at 746; *Kiser*, 284 S.W.3d at 268-69; *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).
>
> We also have recognized that the list of specific circumstances developed through Tennessee caselaw is not exhaustive. *Leach*, 148 S.W.3d at 54 (citing *Davidson*, 121 S.W.3d at 615). Thus, the trier of fact "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim 'after the exercise of reflection and judgment.'" *Davidson*, 121 S.W.3d at 615 (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e))). Ultimately, then, premeditation "may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection

and judgment.'" *Leach*, 148 S.W.3d at 53 (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e))).

*Reynolds*, 635 S.W.3d at 916-17.

Our statutes define criminal attempt as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2018). "Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b) (2018). Serious bodily injury is "not an element of attempted first degree murder," but it "must be put before the jury for sentencing purposes[.]" *Rogers v. State*, No. W2022-00019-CCA-R3-PC, 2022 WL 6957427, at *8 (Tenn. Crim. App. Oct. 12, 2022), *perm. app. denied* (Tenn. Feb. 9, 2023). As relevant here, the term "serious bodily injury" is defined as bodily injury that involves "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; [or] (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(36)(A)-(E) (2018) (subsequently redesignated). The term "bodily injury" includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(3).

The evidence, viewed in the light most favorable to the State, showed that the Defendant became upset with Mr. Ballard because of a comment made sometime around midnight on March 23, 2019. The Defendant then left Mr. Ballard's house on Hyde Park Boulevard, where Mr. Ballard and Mr. Huntley remained. About an hour later, Ms. Hall

arrived at Mr. Ballard's house, and she and Mr. Huntley sat on the sofas in the living room with the television on while Mr. Ballard was listening to music and dancing around in the threshold between the living room and the kitchen area. Approximately fifteen minutes later, the Defendant knocked on the door, and Mr. Ballard let him into the house. The Defendant had discarded his earlier reflective vest and was now dressed in all black. The Defendant and Mr. Ballard were talking and joking around, and there were no obvious problems. After about fifteen minutes, Ms. Hall thought the Defendant had left, but sensed something wrong and turned to see the Defendant quietly closing the front door as he pulled out a gun. No one in the house was armed except the Defendant. The Defendant turned and began to shoot the three unarmed victims. Mr. Ballard was fatally shot in the hip, and the Defendant immediately turned and shot both Mr. Huntley and Ms. Hall. The Defendant shot Ms. Hall a total of six times and Mr. Huntley a total of five times. Ms. Hall briefly attempted unsuccessfully to wrestle the gun away from the Defendant. The Defendant walked over to Mr. Ballard, stood over him, and shot him in the head. The Defendant also returned to Ms. Hall, after already shooting her five times, covered her head with a jacket, and shot her in the head. After being shot the first time or two, Mr. Huntley pretended to be dead, but the Defendant still shot him several more times. Once the Defendant was finished shooting the three victims, he went to the table and took Ms. Hall's and Mr. Huntley's cell phones with him as he left. When the dog was in his way, the Defendant shot at the dog as well.

This evidence overwhelmingly supports the jury's conclusion that the Defendant acted intentionally and with premeditation in the first degree murder of Mr. Ballard and the attempted first degree murders with serious bodily injury of Ms. Hall and Mr. Huntley. This evidence did not support a finding of passion or excitement at the time of the offenses. The Defendant had an apparent motive from an earlier disagreement with Mr. Ballard, procured a weapon, quietly closed the door possibly to conceal the crime before it was committed or to make exit by a victim more difficult, used a deadly weapon on three unarmed victims, was calm before and after the offenses, shot each victim multiple times, and failed to render aid to any of the victims. In addition, the Defendant was talking and joking with Mr. Ballard, and there was no provocation from any of the three victims at the time of the offenses. Although Ms. Hall attempted to wrestle the gun from the Defendant, this was an act of self-defense and defense of others after the Defendant had already begun shooting the three victims. As the Tennessee Supreme Court has noted, circumstantial evidence is sufficient to support the jury's verdicts of guilt on the first degree murder and attempted first degree murder with serious bodily injury charges. *See, e.g.*, *Reynolds*, 635 S.W.3d at 916-17 (finding, as relevant here, that a jury may reasonably infer premeditation from circumstantial evidence of a defendant's "use of a deadly weapon on an unarmed victim," "[t]he particular cruelty of the killing," "[a]ny preparations to conceal the crime undertaken before the crime was committed," "[e]vidence of motive," "[t]he infliction of multiple wounds or repeated blows," and the "lack of provocation" by the victim or

victims[.]"). Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

## B. BIFURCATION

On appeal, the Defendant argues the trial court erred in denying his motion to bifurcate counts six, seven, and eight of the indictment charging him with unlawfully and knowingly possessing a firearm after having been convicted of rape, robbery, and kidnapping, respectively. The Defendant claims that the trial court's denial of his motion to bifurcate put him in the "untenable position of choosing between the State being allowed to enter into evidence certified copies of his prior convictions for rape, robbery[,] and kidnapping[,] or stipulating that he has prior convictions for felonies involving the use or attempted use of violence." The Defendant asserts the stipulation unduly prejudiced his defense by informing the jury that he had previously been convicted of unnamed violent felonies, thus inviting the jury to speculate as to what the unnamed felonies were. He further contends that the stipulations were the functional equivalent of guilty pleas to the three counts. The Defendant also argues that the trial court's reading of the stipulation to the jury immediately after opening statements, but prior to any other evidence, was highly prejudicial because it gave the jury the perception that the Defendant was a violent felon before any other evidence or testimony was introduced. The State argues that the trial court acted within its broad discretion in denying the Defendant's motion to bifurcate.

A trial court's decision not to bifurcate certain counts of a defendant's indictment from the others at trial necessarily concerns the admissibility of evidence. Consequently, as with other trial court rulings on the admissibility of evidence, we review this determination for an abuse of discretion. *See State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002) (citing *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997). As this court has previously noted, when a defendant "is charged with offenses involving the use of violence and force and also charged with the status offense of unlawful possession of a firearm for having a similar prior felony conviction," the "better practice" is to bifurcate the unlawful possession of a firearm charge from the remaining counts. *State v. Foust*, 482 S.W.3d 20, 46-47 (Tenn. Crim. App. 2015); *see also State v. Curry*, 705 S.W.3d 176, 181 n.3 (Tenn. 2025) ("Clearly, bifurcation is the better practice."). While referred to as the better practice, "no procedure has been prescribed by [the appellate courts] for bifurcation proceedings in contexts involving a charge of possessing a firearm as a convicted felon." *State v. Johnson*, No. W2018-01222-CCA-R3-CD, 2019 WL 6045569, at *11-14 (Tenn. Crim. App. Nov. 14, 2019), *perm. app. denied* (Tenn. Apr. 1, 2020). Nevertheless, we have repeatedly reaffirmed that bifurcation is not mandatory. *See, e.g., State v. Howard*, No. W2020-00207-CCA-R3-CD, 2021 WL 144235, at *4 (Tenn. Crim. App. Jan. 15, 2021), *perm. app. denied* (Tenn. May 14, 2021); *State v. Buchanan*, No. M2017-02268-CCA-R3-CD, 2019 WL 852192, at *2 (Tenn. Crim. App. Feb. 21, 2019), *perm. app. denied*

(Tenn. Apr. 11, 2019); *State v. Richardson*, No. W2016-02227-CCA-R3-CD, 2018 WL 821775, at *16 (Tenn. Crim. App. Feb. 9, 2018), *no perm. app. filed*. Furthermore, in prosecutions for charges of unlawful possession of a firearm by a convicted felon, disclosure of a defendant's prior felonies is "relevant to establish an essential element of the crime for which the defendant is being tried." *Foust*, 482 S.W.3d at 47 (citing *James*, 81 S.W.3d at 760-61).[3] As relevant here, "[a] person commits an offense who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon[.]" Tenn. Code Ann. § 39-17-1307(b)(1)(A) (2018).

The day before the trial began, the Defendant moved to bifurcate the unlawful possession of a firearm counts from the remainder of his charges. The Defendant argued that permitting the jury to learn of his prior violent felony offenses while simultaneously determining his guilt for other violent felony offenses would be unfairly prejudicial. The Defendant further requested that if his motion was denied, the trial court should allow him to stipulate solely that he had previously been convicted of violent felony offenses and to redact the names of the prior convictions from the indictment.

The trial court denied the Defendant's motion to bifurcate in a bench ruling. After discussing the history of the analysis of similar bifurcation requests and referencing certain of its previous decisions which had been affirmed on appeal, the trial court determined bifurcation was not required but accepted the Defendant's proposed alternative of a stipulation. At trial, the trial court read the following stipulation to the jury after opening statements and issued the following contemporaneous limiting instruction:

> Exhibit Number 1 will be a stipulation or agreement – stipulated or agreed facts regarding Counts 5, 6, and 7 convicted felon in possession of a firearm.
>
> And I will tell you, ladies and gentlemen, that a stipulation is an agreement and that all parties are bound by this agreement as if this had been testified to in open court by other witnesses.
>
> And it reads as follows, Exhibit Number 1, it is stipulated or agreed by all the parties that on the date of this incident, between March 22nd, 2019 and March 25th, 2019, [the Defendant] had been previously convicted of felony convictions involving the use or attempted use of violence to a . . .

---

[3] The Defendant concedes that while this court has previously held that bifurcation of such issues is generally the "better procedure," neither this court nor the Tennessee Supreme Court have specifically required the bifurcation of status offenses such as the ones charged in counts six through eight here.

person[.] These previous convictions are enumerated in Counts 6, 7, and 8 of Indictment 19-02071.

It is stipulated or agreed that the Defendant had been convicted of the prior crime of violence to the person, included in Counts 6, 7, and 8 and was on notice as a convicted felon that he could not own, possess, or handle a firearm.

The elements of this offense requiring the State to prove that the Defendant has convictions of prior crimes of violence to the person, that he was aware on March 22nd, 2019, that he could not own, possess, or handle a firearm, have been proven beyond a reasonable doubt.

And this is signed, ladies and gentlemen, by the Defendant[,] Isaiah French, by Mr. Renken, and also by Ms. Dwyer, as the attorney for the State.

And I'm going to give you this contemporaneous instruction also. That if you find from the evidence – and this is the stipulation that all parties have agreed to – that Mr. French has been convicted of another crime or crimes, other than that for which is presently on trial, you may not consider such evidence as proof of his disposition to commit the crime for which he is on trial.

You may consider any prior felony convictions as an element of the offense of being a convicted felon in possession of a firearm, and for no other purpose.

In other words, ladies and gentlemen, what the State could do, they could call a fingerprint technician to come to court and fingerprint [the Defendant]. They could order those certified judgments of convictions from other states that were indicated in Counts 6, 7, and 8 of the indictment. Have a fingerprint expert come to court and compare those fingerprints from those judgments to [the Defendant] fingerprints in court and tell you he is, in fact, the same person that has been convicted of those offenses.

And the lawyers are stipulating that he has, in fact, been convicted of those offenses. That he was instructed by a judge that he could not possess, own, or carry a firearm. And instead of calling those witnesses in court, all parties are stipulating that if those witnesses were called, that is what those folks would tell you and that, in fact, he is the same person who has been convicted of those felony offenses in Counts 6, 7, and 8 of the indictment.

- 12 -

And, again, you can consider that only as to whether or not [the Defendant]is a convicted felon in possession of a firearm. You cannot say this is propensity, if he's been convicted of something else, he must be guilty of everything for which the State has indicted him.

The trial court gave another limiting instruction regarding the jury's consideration of the Defendant's prior convictions in its final charge to the jury.

As noted above, while bifurcation is not mandatory, the trial court may nevertheless order it "upon concluding that a bifurcated proceeding is necessary in order to avoid undue prejudice." *Howard*, 2021 WL 144235, at *3 (internal quotation marks omitted) (citing *Johnson*, 2019 WL 6045569, at *13). Of course, it is the defendant's burden to establish prejudice, and here, the Defendant has failed to carry that burden. Initially, we note that several of the Defendant's claims of prejudice are waived. The Defendant claims that the trial court's reading of the stipulation to the jury immediately after opening statements, but prior to any other evidence, was highly prejudicial because it gave the jury the perception that the Defendant was a violent felon before any other evidence or testimony was introduced. However, Defendant failed to make a contemporaneous objection when the trial court read the stipulation, and he failed to raise the issue in his motion for new trial; thus, this issue is waived. *See* Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived."); *see also State v. Nunez*, No. M2024-00179-CCA-R3-CD, 2025 WL 1892446, at *3 (Tenn. Crim. App. Jul. 9, 2025), *no perm. app. yet filed* ("To preserve an issue, the party should first assert a timely objection identifying a specific ground. The party then must later raise that issue in a motion for a new trial."). Similarly, the Defendant's claim that the stipulation was the functional equivalent of a guilty plea to counts six through eight was not raised in his motion for new trial. Therefore, the issue is waived. Tenn. R. App. P. 3(e); *Nunez*, 2025 WL 1892446, at *3.

## III. CONCLUSION

Following our review of the record and based on the foregoing analysis, we affirm the judgments of the trial court.

s/ *STEVEN. W. SWORD*

STEVEN W. SWORD, JUDGE

- 13 -